UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------X
CITY CALIBRATION CENTERS INC, and
PLATSKY COMPANY, INC,

                                            MEMORANDUM & ORDER
                    Plaintiffs,            22-CV-7845 (JS)(ST)

        -against-

HEATH CONSULTANTS INC.,

                    Defendant.
--------------------------------X
APPEARANCES
For Plaintiffs:      Steven R. Schlesinger, Esq.
                     Jillian Lee McNeil, Esq.
                     Stanley A. Camhi, Esq.
                     Jaspan, Schlesinger & Hoffman, LLP
                     300 Garden City Plaza, Fifth Floor
                     Garden City, New York  11530

For Defendant:       Jeremy Evan Deutsch, Esq.
                     Elliot James Coz, Esq.
                     Hallie McDonald, Esq.
                     Cozen O'Connor
                     3WTC, 175 Greenwich Street, 55th Floor
                     New York, New York  10007

SEYBERT, District Judge:

        Heath Consultants Inc. ("Defendant" or "Heath") moves,
pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure,
to dismiss the First Amended Complaint (the "FAC") (ECF No. 27) of
Plaintiffs Plasky Company, Inc. ("Platsky") and City Calibration
Centers Inc. ("City Calibration" and collectively with Platsky,
"Plaintiffs") (hereafter, the "Dismissal Motion"). (See Dismissal
Motion, in toto, ECF No. 29.)  For the reasons that follow,
Defendant's Dismissal Motion is GRANTED IN PART AND DENIED IN PART.

BACKGROUND[1]

I.   The Parties

City Calibration "is a New York limited liability company having its principal place of business at 298 Montrose Road, Westbury, New York 11590."  (FAC ¶ 17.)

Platsky, "is a New York corporation having its principal place of business at 298 Montrose Road, Westbury, New York 11590." (Id. ¶ 18.)  Platsky is the parent company of City Calibration. (Id. ¶ 34.)  Traditionally, Platsky was "a plumbing shelf goods wholesale representative"; however, "over the years, it has transitioned to an agency with a diverse product line, working directly with wholesalers, contractors, architectural designers, and engineers."  (Id.)

Heath "is a Texas corporation having its principal place of business at 9030 Monroe Road, Texas 77061." (Id. ¶ 19.)  "Heath has been doing business since 1933 and specializes in the development of products and the provision of services for the detection and prevention of gas leaks."  (Id. ¶ 22.)  "These products and services include the development and manufacturing of gas detection devices and their related parts and accessories, as well as the provision of gas leak investigation and inspection

───────────────

[1] The facts set forth herein are taken from the FAC and are accepted as true for purposes of the instant Motion.  See generally Lynch v. City of N.Y., 952 F.3d 67, 75 (2d Cir. 2020).

2

services, underground utility damage prevention, and meter/reading services."  (Id.)  Relevant here, Heath also "develops and sells products and services intended for use by" licensed master plumbers ("LMPs") "in the New York City Area."  (Id. ¶ 23.)

II.   Local Law 152 and the LMP200

"In 2016, New York City enacted New York City Local Law 152" ("Local Law 152").  (Id. ¶ 24.)  Local Law 152 "requires all buildings in New York City (with some limited exceptions) to have their gas piping systems inspected by a LMP at least once every four years, beginning on January 1, 2020."  (Id.)  Additionally, Local Law 152 "requires LMPs to provide each building owner with a Gas Piping System Periodic Inspection Report and certification." (Id. ¶ 25.)  "Building owners are required to maintain all reports and certifications for ten years."  (Id.)  LMPs are not subject to this record retention provision; however, Plaintiffs aver "it is the best practice for LMPs to maintain their records for the same period of time for liability purposes in the event something goes wrong with the gas piping in a given building."  (Id.)

The LMP200 is the central product to Heath's LMP business.  (Id. ¶ 26.)  "The LMP200 is a gas detection tool intended for use by the plumbing and HVAC communities in the New York City Area to meet the requirements of Local Law 152."  (Id.) The LMP200 was "developed collaboratively with Con-Edison, National Grid and the LMPs and collected additional information

3

specific to the New York City metropolitan area." (Id.) LMPs, and their technicians, use the LMP200 "to conduct regulatory compliant leak surveys of gas piping inside buildings." (Id. ¶ 27.) "Heath advertises that the LMP200 can then transfer those leak surveys, via Bluetooth, to applications running on smart devices so that the LMP or Utility can visualize the data and then store it in the cloud for regulatory reporting purposes down the road." (Id.) LMPs also use the LMP200 as part of their daily duties, "including purging of interior piping and providing atmosphere monitoring for both flammable gas and carbon monoxide." (Id. ¶ 28.)

"Heath also sells and distributes" a product known as an ABC Station, together with the gasses[2] required for the ABC Station's operation (collectively with the LMP200, the "Products"). (Id. ¶ 29.) Every 30 days, "[t]he LMP200 requires calibration on an ABC Station." (Id.) Failure to do so will result in the LMP200 becoming disabled. (Id.) "This is a safety measure to ensure the LMPs are obtaining accurate results during their gas inspections." (Id.)

While Heath occasionally "distributes its products and provides services directly to the consumer", generally, "it enters into distribution and/or service agreements with partners having

---

[2] Herein, the Court adopts Plaintiffs' use of the non-standard plural form of "gas".

knowledge and experience in the relevant marketplaces."
(Id. ¶ 31.)  Plaintiffs contend this was also the case with the
LMP200.  (Id. ¶¶ 32-33.)  Plaintiffs allege sometime "in or around
late 2018, Heath sought out Platsky, which had been recommended to
Heath by several industry insiders, to enter into a potential
supplier/distributor relationship."  (Id. ¶ 33.)

III.   The Formation of City Calibration and the 2019 Agreement

      A. City Calibration

         "From the start of its negotiations with Heath, Platsky
principals knew they would need to create a new entity to enter
into any long-term distribution agreement with Heath" and "to run
the business associated with the distribution and service of
Heath's LMP200 and its related accessories, including the ABC
Stations, and, eventually, conduct business related to the
technology it intended to create as part of the deal."  (Id. ¶ 37.)
To meet this need, on February 4, 2019, City Calibration was
formed.  (Id. ¶ 38.)

      B. The 2019 Agreement

         On January 28, 2019, prior to City Calibration's
formation, "Platsky and Heath negotiated and entered into an
exclusive distribution agreement by which Heath engaged Platsky,
'as the sole distributer'" of the Products, "and associated
accessories for use with the New York City plumbing contractors."
(Id. ¶ 39; see also 2019 Agreement, Ex. B, ECF No. 27-2, attached

to FAC.)  Plaintiffs contend "[e]xclusivity was a material term of the contract[]", and, that absent exclusivity, "Platsky would not have entered into the agreement."  (Id. ¶ 40.)  Plaintiffs assert "[t]he market for the Products was relatively small, such that a non-exclusive distributorship would . . . not have been worth the financial investment."  (Id.)

"Platsky and its affiliate, Platsky HVAC-R, were named as parties to the 2019 Agreement".  (Id. ¶ 41.)  While City Calibration is not a named party to the 2019 Agreement, Platsky alleges it "made clear to Heath at this time that it would be forming a third entity through which the business of the 2019 Agreement would be conducted."  (Id.)

Plaintiffs assert that Heath notified them "in the 2019 Agreement that the LMP200 would cease to operate if it was not timely calibrated", but that Heath "knowingly omitted that the LMP200 would also stop working if the data it collected was not regularly cleared from the device and stored in the Cloud, which, at the time of the execution of the 2019 Agreement, Heath had no means to do."  (Id. ¶ 42.)  Had Platsky known of these limitations with the LMP200, Plaintiffs contend Platsky either (1) would "not have entered into the 2019 Agreement", or (2) "would have negotiated different terms."  (Id. ¶ 53.)

While profit margins for sale of the LMP200 were narrow, Plaintiffs aver "[t]he 2019 Agreement anticipated additional

6

profits for Platsky in the sale of the accessories, calibration equipment, installations and replacement gasses themselves[.]" (Id. ¶ 43.)  The 2019 Agreement further "provided for the opportunity for Platsky to provide the calibration as a service." (Id.)  Since calibration of the LMP200 "needed to be done on a monthly basis" this "would generate a stream of repeat business for Platsky."  (Id.)  As to calibration, "the 2019 Agreement provided that Platsky would be responsible for the installation of the ABC calibration station as well as maintaining the associated calibration records for the contractor."  (Id. ¶ 44 (internal quotation marks omitted).)  "Platsky was to autonomously run this portion of the business to", inter alia, "help maintain consistency in the market, [and] availability of information for contractors who need access to calibration reports etc."  (Id. (internal quotation marks omitted).)

        "The term of the 2019 Agreement was through September 20, 2020" (id. ¶ 47) and was "binding upon and inure[d] to the benefit of [Platsky] and its successors and assigns." (Id. ¶ 46 (quoting 2019 Agreement § 12(b)).)  Plaintiffs allege that "[t]he 2019 Agreement was to be for a limited time period [so as to] allow[] Platsky to test the market before entering into a longer-term distribution agreement and to develop the business that would become City Calibration."  (Id. ¶ 50.)  Plaintiffs contend "Heath and Platsky agreed to evaluate the 2019 Agreement every six months

7

beginning October 1, 2019." (Id. ¶ 47.) If Heath chose to terminate the 2019 Agreement, "it was to be Heath's sole responsibility to buy back all approved and agreed upon [LMP200] devices and ABC calibration stations from Platsky." (Id.)

Paul D. Wehnert ("Wehnert"), Senior VP of Sales & Marketing, executed the 2019 Agreement on behalf of Heath. (Id. ¶ 48.) Jordan Stern ("Stern"), "then VP of Business Development", executed the 2019 Agreement on behalf of Platsky. (Id. ¶ 49.) Plaintiffs allege, "[b]oth Platsky and Heath always knew and planned for (1) the creation of City Calibration; and (2) a new, long-term, exclusive distribution agreement." (Id. ¶ 51.) Plaintiffs aver:

> [W]hen it entered into the 2019 Agreement, Platsky relied upon Heath's representations that (1) Heath had the ability to grant Plaintiffs an exclusive distributorship of all of the Products described in the 2019 Agreement, and (2) the LMP200 could connect via Bluetooth to a service provider's personal device to efficiently store and transfer the data through software applications already created by the local utility companies.

(Id. ¶ 52.) Plaintiffs assert, "[w]ithout these representations, Platsky would not have entered into the 2019 Agreement." (Id.) Similarly, Plaintiffs aver Platsky would neither "have created City Calibration nor invested large sums of money into the development of its calibration business" without Heath's representations and omissions. (Id. ¶ 54.)

C. Operation of the Business Under the 2019 Agreement

1. The Calibration as a Service Business

"From January 2019 through March 2021, Heath and Platsky engaged in the respective supply and distribution of the Products as per the terms of the 2019 Agreement." (Id. ¶ 56.) After formation of City Calibration, "Heath and Platsky jointly drafted and published a press release regarding the partnership created by the 2019 Agreement, stating that 'Platsky Company Inc. will distribute Heath's custom portable gas detectors to the Metropolitan New York area through a newly formed company called City Calibration Centers.'" (Id. ¶ 58.) "The press release described City Calibration's plan to open 'strategically located calibration stations at established plumbing supply wholesalers throughout all five boroughs of New York City, Westchester, Long Island, and northern New Jersey.'" (Id. ¶ 59.)

In accordance with the 2019 Agreement, "Platsky was trained on the operation and functionality of the LMP200 and the operation and installation of the ABC Stations." (Id. ¶ 60.) "Platsky then was responsible for the installation of the ABC Stations as well as for maintaining the associated calibration records for each contractor." (Id.)

Since the LMP200 needed to be calibrated every 30 days, and since this was an area of the business in which City Calibration envisioned long-term profits, "with Heath's knowledge,

9

City Calibration determined that it would not sell the ABC Stations (which performed the Calibration) directly to the consumer, but, instead, would create fractional franchises to perform the calibration services at local wholesale retailers, readily accessible to the LMPs." (Id. ¶¶ 64-65.) The announcement of City Calibration's business model was part of the joint 2019 Press Release. (Id. ¶ 65.) Additionally, as part of its calibration service, "City Calibration also provided the service of extracting and maintaining the calibration data for its customers." (Id. ¶ 66.)

### 2. City Calibration's Manual Extraction of the LMP200's Data

A third, unexpected, area of business arose as the parties operated under the 2019 Agreement in that "Plaintiffs quickly learned that the LMP200 device's memory filled quickly and needed to be cleared on a regular basis to maintain functionality." (Id. ¶ 67.) This created a "business around the collection and maintenance of the LMP200's inspection data." (Id.)

Plaintiffs aver, prior to execution of the 2019 Agreement, Heath represented that the LMP200 device could connect via Bluetooth "to various handheld devices through an existing smart app" designed to manage the device's data. (Id. ¶ 68.) Specifically, Plaintiffs allege "Heath represented that software was already in place" from Con-Edison and National Grid, "and that

10

those companies were either already or would soon be using their own smart app to access the data from the LMP200 devices." (Id.) "Heath represented that this would enable City Calibration to quickly and efficiently develop its own version of a smart app to collect data from the LMP200 devices with Heath's assistance." (Id.)  Plaintiffs contend Heath's representations were false. (Id. ¶ 69.)  Specifically, Plaintiffs allege "[n]ot only had the Utility Companies not yet made available a fully function[al] smart app," but LMPs were hesitant to use any app that was developed because: "(1) they would need to use different apps based on the Utility company used by each building they inspected, and (2) the LMPs did not want to share all of their data with the Utility companies." (Id.)

Plaintiffs allege Heath also "failed to inform Plaintiffs that the LMP200s needed to have their data cleared on a regular basis in order to maintain functionality, and that Heath had, at the time, no technology in place to clear and store the data in any manner." (Id. ¶ 71.)  Consequently, City Calibration had to develop its own software and system "from scratch" "to manage the data clearing and storage issues." (Id. ¶ 72.) Plaintiffs contend Heath was unable to assist City Calibration "in developing the requisite software because it simply did not have the experience it claimed it did with transferring the LMP200 data." (Id. ¶ 73.)  In developing its own smart app without

11

Heath's assistance, Plaintiffs "expended extensive time and resources." (Id. ¶ 74.) Moreover, prior to development of the smart app, City Calibration "also had to create and utilize a computer-based software that required a hard-wired computer to extrapolate the data from the LMP200, convert it to a pdf from a raw data file, and send it to City Calibration's cloud and then on to the customer." (Id.) This manual extraction was a "tedious process" and "required the hiring of additional staff and the purchase of additional vehicles and equipment." (Id. ¶ 75.) Plaintiffs maintain that development of the manual data extraction process, together with its implementation, was not the deal they had intended to make with Heath since it "was far more expensive for City Calibration" than anticipated. (Id. ¶ 77.) This added expense, Plaintiffs allege, flowed directly from Heath's alleged misrepresentation of the device's capabilities. (Id.)

### 3. City Calibration's Development of a Smart App

The development of a smart app created the possibility for a fourth area of business for City Calibration. (Id. ¶ 78.) Development of the smart app would enable "customer[s] to connect the LMP200 device to their phone or other personal device to (1) extract the tool data . . . resolving the data storage issues and eliminate the need for manual extraction; and (2) maintain readily accessible records in the Cloud for each of the customer's jobs." (Id.) Plaintiffs assert "Heath was

12

supportive of Plaintiffs' pursuit of a new, better functioning smart app." (Id. ¶ 79.) To that end, "Heath connected Plaintiff[s] directly with Heath's manufacturer, GMI, to obtain the necessary technical information required for City Calibration to develop its proposed technology." (Id.)

"GMI is one of the world's largest manufacturers of gas and flame detection products and is located in the United Kingdom." (Id. ¶ 80.) "Heath is GMI's primary distributor in the United States." (Id.) Since "neither City Calibration nor Platsky had a direct relationship with GMI", Heath's Vice President of Sales, Gerald Sims ("Sims")[3], "facilitated the negotiation of a non-disclosure agreement between City Calibration and Heath." (Id. ¶ 81.) The GMI non-disclosure agreement (the "GMI NDA") "was intended to protect both the technical information provided by GMI to City Calibration, and the intellectual property developed by City Calibration." (Id. ¶ 83.)

IV. The Expiration of the 2019 Agreement and the Alleged 2021 Agreement

Plaintiffs allege that while sales in the first year and a half "were slow", by the "summer of 2020, sales began to accelerate, and the Parties determined to continue their exclusive distributor relationship." (Id. ¶¶ 84-85.) Consequently, "prior

---

[3] Gerald Sims took over this role from Wehnert. (See FAC ¶ 81.)

to the September 30, 2020 termination date of the 2019 Agreement," Plaintiffs allege "Heath and Plaintiffs engaged in active negotiation[s] [for] the renewal of the 2019 Agreement or the creation of a new contract."  (Id. ¶ 86.)  Plaintiffs assert "[n]either Sims nor any other representative of Heath ever told Plaintiffs that Heath intended to allow the agreement to lapse nor that it had otherwise ended Platsky's role as a distributor for Heath."  (Id. ¶ 87.)  On the contrary, Plaintiffs allege "[o]n behalf of Heath, Sims represented on multiple occasions to . . . Stern . . . that Heath was renewing the agreement." (Id. ¶ 88.)

        "[O]n July 23, 2020, Sims wrote in an email to Heath's 'Manager of Legal,' Victoria Quinones" ("Quinones"), copying Stern and Eric Six ("Six"), Heath's New York sales consultant, "that 'Platsky is our sole distributor of the . . . LMP200.  We have a current agreement with him.  We need to renew this agreement[,] so I've asked [Stern] to red line the current document with changes he is requesting and email it to you and I [sic] for review." (Id. ¶ 89.)  Plaintiffs allege "Sims directed Stern to speak directly with Quinones," and, further, that "Stern was led to believe [Quinones] was Heath's general counsel and was an attorney with the authority to negotiate contracts on behalf of Heath." (Id. ¶ 90; see also id. ¶ 91.)

From July 2020 until March 2021, when Quinones sent Stern what Plaintiffs allege was the final Agreement, Plaintiffs contend "Heath and Stern were actively engaged in negotiations regarding new terms for the Agreement." (Id. ¶ 92.) "These new terms were expressly intended to protect the App and other intellectual property City Calibration was developing and to provide a mechanism for use of that App on a nationwide scale." (Id.)

Plaintiffs highlight, "Sims was always involved in the review of the drafts and was copied on a significant portion of the correspondence regarding the negotiations." (Id. ¶ 93.) Plaintiffs aver "Sims continually directed Stern to Quinones for redlining or otherwise providing changes to the draft agreements", including on August 10, 2020, when Sims inquired whether Stern had had "a chance to send [Quinones] [his] redlines for contract changes[.]" (Id.) Plaintiffs estimate "negotiation of the new Agreement took . . . slightly more than five months [] because the Agreement covered additional terms and Plaintiffs had to work with their attorneys to ensure that their intellectual property rights were protected." (Id. ¶ 94.) Plaintiffs contend "City Calibration's intent to develop the App was therefore necessarily a large part of the[] discussions." (Id. ¶ 95.) During the negotiations, Plaintiffs assert "both Heath and Plaintiffs continued to operate under the terms of the 2019 Agreement." (Id. ¶ 96.)

15

"On March 2, 2021, at the direction of Sims, Quinones contacted Stern stating that she had 'received the redlines from'" Sims, "and requested a call to discuss the [redlines] with Stern." (Id. ¶ 97.)  On March 3, 2021, Plaintiffs allege that "Quinones and Stern negotiated the finalization of the Agreement over the Phone."  (Id. ¶ 98.)  As part of their discussion, "Stern and Quinones exchanged different versions of the Agreement for discussion purposes." (Id.)  Plaintiffs contend "[b]y the end of the call, the Parties agreed upon a version of the Agreement that built upon Heath's standard agreement, but contained certain additional terms required by City Calibration." (Id. ¶ 99.)

On March 4, 2021, "Quinones emailed Stern, writing 'I have reviewed the changes, and the proposed insertions are acceptable. Please sign and return at your earliest convenience.'" (Id. ¶ 100.)  "Sims was copied on the email" and Plaintiffs aver Sims "had already approved the terms of the agreement."  (Id. ¶ 101.)  On March 9, 2021, at Quinones' direction, Stern signed the Agreement "on behalf of City Calibration and Platsky . . . and returned it to Heath, believing that Heath had already accepted the terms."  (Id. ¶ 102.)  "Plaintiffs never received a countersigned version of the Agreement." (Id. ¶ 103.)  Rather, "Plaintiffs believed—and acted in accordance with [this] belief— that Sims had in fact signed the agreement on behalf of Heath." (Id.)  Moreover, Plaintiffs allege Sims confirmed their belief

16

when, days later, Sims called Stern, "to congratulate him on getting the deal done." (Id.) Specifically, Plaintiffs aver Sims called Stern and told him, "I told you I'd get the deal done for you. Congratulations. When am I going to see you again?" (Id. ¶ 104.) In addition to Sims' congratulatory statement, Plaintiffs emphasize that "Heath's execution of the Agreement was further confirmed by its performance under its terms for well over one year." (Id. ¶ 105.)

A. The Terms of the 2021 Agreement

Plaintiffs contend, after Stern had signed and returned the 2021 Agreement to Quinones, "Heath operated under the terms of the new Agreement." (Id. ¶ 106.) Plaintiffs highlight, "Heath confirmed the existence of the Agreement by supplying City Calibration with the Products, and City Calibration, through its affiliate Platsky, made payments to Heath for the Products, as per the terms of the Agreement." (Id.) Plaintiffs contend "[t]his was in accordance with the practices established by the Parties under the 2019 Agreement—to which Platsky HVAC-R was a party, despite not being the entity billed—and continued during the negotiation period." (Id. ¶ 107.)

Under the 2021 Agreement, "Heath appointed City Calibration as the exclusive distributor of the LMP200, the ABC Station, and the calibration gasses and associated accessories within North America." (Id. ¶ 108.) "In return, City Calibration

17

agreed to purchase the Products from Heath under the terms and conditions of the Agreement." (Id.)  Plaintiffs aver that, like the 2019 Agreement, "[e]xclusivity was an essential term of the [2021] Agreement for City Calibration and its principals." (Id. ¶ 109.)  "The Agreement is governed by the laws of the State of New York and provides for arbitration in accordance with the Commercial Arbitration Rules of the American Arbitration Association." (Id. ¶ 121.)

     As to the App, "[a]ll customer data was to be owned solely by City Calibration." (Id. ¶ 110.)  Further, "Heath was restricted from permitting any third person 'to develop Software that is compatible with (or connects to) any Product, including any Software that transmits or processes any Customer Data to or from the Product, unless that third person was a utility company, as defined in the Agreement.'" (Id. ¶ 111 (quoting 2021 Agreement, Ex. A, ECF No. 27-1, attached to FAC.))  The Agreement described City Calibration's App as "Software developed by [City Calibration] for the purpose[] of integrating Teledyne's PS200-LMP portable gas detection instrumentation to an application being developed by the Company on a handheld mobile device via a Bluetooth wireless interface." (Id. ¶ 123.)  Based upon the protections in the 2021 Agreement, City Calibration began working "with software engineers to develop the App, expending extensive resources to do so." (Id. ¶ 125.)

18

"The term of the Agreement was seven years, followed by automatic renewal for additional successive periods of two years each." (Id. ¶ 114.)  "After the initial seven-year term either Party could decide not to renew the Agreement by providing written notice either thirty or sixty days prior to the end of the current term (depending on timing)." (Id.)  "Either Party could also terminate the Agreement upon the breach of the Agreement by the other Party with ten days written notice." (Id. ¶ 115.)  In such instances, "[t]he breaching party was given an opportunity to cure any breach." (Id.)

Article IV of the 2021 Agreement allegedly contained the "Price, Payment and Deliver[y] Terms" and states, in pertinent part:

> Distributor shall purchase the Products for its own account from Heath.  Initial prices for the Products are listed in Exhibit A. Prices may be changed at any time by Distributor on ninety (90) days' prior written notice to Distributor, provided that prices shall not increase in any calendar year occurring during the Term more than five percent (5%) above the price that was in effect during the immediately preceding calendar year occurring during the Term. Exhibit A may be revised as necessary to reflect the implementation of mutually agreed upon price changes.

(Id. ¶ 116 (quoting 2021 Agreement § 4.2).)  Plaintiffs contend "[t]he actual dollar value of the sales price to be included as Exhibit A was not material to the contract" because "Heath decided

upon the price of the Products based upon the volume and timing of the order and included that price within the invoices it sent to Platsky."  (Id. ¶ 117.)  Plaintiffs estimate that "price always remained around $1000, fluctuating by approximately one to two hundred dollars on any given order."  (Id.)  Plaintiffs state "[t]his remained the practice of the parties . . . throughout their relationship" and, moreover, that this "was consistent with industry standards."  (Id. ¶ 118.)

Regarding insurance terms, the 2021 Agreement stated that "Distributor . . . agreed to maintain such insurance acceptable to Heath as set for[th] on Exhibit D, Insurance Requirements."  (Id. ¶ 119.)  Plaintiffs aver, "[a]s City Calibration already maintained insurance acceptable to Heath and had already been provided with Heath's insurance requirements, Exhibit D was", "also not material to the Agreement."  (Id. ¶ 120.)

B. The Parties' Performance Under the 2021 Agreement

During the time under which the Parties allegedly operated under the 2021 Agreement, City Calibration "believed it was the sole distributor of the ABC Stations and related [gasses] and accessories in the New York City Metropolitan Area."  (Id. ¶ 127.)  Additionally, "Heath worked directly with Plaintiffs to sell, market, and service the Products."  (Id. ¶ 128.)  For example, Six "appeared in a video posted on City Calibration's website describing to LMPs how to use the LMP200 and referring the

20

LMPs directly to Heath's 'partner City Calibration.'" (Id.) "Six closes the video by referring the viewer to City Calibration's local calibration centers to conduct the required 30-day calibrations and tells the viewer to contact City Calibration for technical support and questions." (Id. ¶ 129.) "At the time, Sims was Six's direct manager." (Id.)

Following execution of the 2021 Agreement, "Heath continued to invoice Platsky and ship Products to either Platsky, or, on at least one occasion, to City Calibration." (Id. ¶ 131.) Likewise, "Platsky continued to pay each invoice, as was the Parties' practice from the onset of their relationship in 2019." (Id.) "Further, Heath continued to charge Plaintiffs at a similar rate as it did under the 2019 contract." (Id. ¶ 132.) Plaintiffs aver this "price fluctuated between approximately $900 and $1200 depending on the volume and timing of the order." (Id.)

In accordance with Section 5.1 of the 2021 Agreement, Plaintiffs allege that "Heath also issued Plaintiffs credits and replacement devices as a result of malfunctioning devices." (Id. ¶ 133.)

C. Heath's Alleged Breach of the 2021 Agreement

In Summer 2022, Heath ceased communications with Plaintiffs. (Id. ¶ 134.) In approximately July 2022, "Plaintiffs discovered that Heath was taking steps to advertise and sell the Products covered by the Agreement directly to consumers in the New

21

York City Metropolitan Area market." (Id. ¶ 134-35.) Plaintiffs discovered Heath's entrance into the New York City Metropolitan Area market "when one of City Calibration's customers sent it a Heath advertisement it had received through the local plumbers' union." (Id. ¶ 138.) "In [the] advertisement, Heath stated that [it] was 'pleased to announce that [Heath] will be taking over direct sales and support of the LMP 200 device designed by the plumbing community for their use to meet NYC Local Law 152.'" (Id. (emphasis in original).) As part of its entry into the market, Heath "also offered its own 'on-site' calibration services." (Id.)

"[A]s Heath began to move into the market as a distributor as well as the supplier, Heath [also] began to move into the calibration business, taking City Calibration's customers for itself." (Id. ¶ 139.) Plaintiffs allege "Heath admits it has sold multiple ABC stations directly to consumers in" City Calibration's market, and, that, since a single ABC station can service many LMPs, "the sale of only a small number of ABC stations negatively impacts City Calibration's calibration business significantly." (Id.)

When Stern learned of Heath's attempted entry into the New York City Metropolitan Area market, he contacted Sims "to notify Heath of the suspected breach of the Agreement and to attempt to resolve the issue." (Id. ¶ 140.) Sims denied the

22

existence of the 2021 Agreement.  (Id.)  On September 21, 2022, Heath, through legal counsel, sent Plaintiffs "a letter further denying the existence of the Agreement and directing Plaintiffs to cease communication with Heath regarding the issue." (Id. ¶ 141.)

In October, Plaintiffs contend they began to receive inquiries from customers that "were confused as to who they were supposed to contact regarding the sale and repair of the Products and for the provision of the related calibration services." (Id. ¶ 142.)  Plaintiffs aver "City Calibration is . . . being closed out of the business they had contracted for and has lost and continues to lose its customer goodwill, relationships and sales revenues."  (Id. ¶ 143.)

In or around December 6, 2022, "Heath announced that it was developing and intended to bring to market its own App that will directly compete with and replace the App developed by Plaintiffs."  (Id. ¶ 145.)  "Shortly thereafter, Neil Aranoff, a representative of Plaintiffs," contacted Six "to inquire about the fulfillment of an outstanding order of Products" but was informed by Six that he "was no longer handling Plaintiffs' account and that Heath would not be fulfilling Plaintiffs' outstanding order or otherwise providing Products to Plaintiffs." (Id. ¶ 146.)  "On or around February 1, 2023, City Calibration discovered that Heath had posted a link to free software that allows for the clearing of data from the LMP200 devices on its website."  (Id. ¶ 147.)

23

Plaintiffs aver "[t]his further undermines a substantial portion of City Calibration's calibration services business[.]" (Id.)

Plaintiffs highlight that Nassau and Suffolk Counties "have both announced that they are enacting or have already enacted laws similar to Local Law 152, such that an enormous market in the New York City Metropolitan Area is about to open for the distribution and servicing of the Products." (Id. ¶ 155.) Plaintiffs speculate that "Heath knew that this expansion was imminent—and therefore, that the potential for making profits off of the sale and servicing of the Products was to soon be multiplied—" when it allegedly breached the 2021 Agreement. (Id. ¶ 159.)

## PROCEDURAL HISTORY

On December 21, 2022, Plaintiffs commenced this case by way of Complaint, initially filing the Complaint with the Supreme Court of the State of New York, Nassau County (the "State Court"). (See Verified Complaint, Ex. A-1, ECF No. 1-1, attached to Notice of Removal.)  On December 23, 2022, Heath removed the case to this Court. (See Notice of Removal, ECF No. 1.)   Prior to removal, on December 23, 2022, the State Court issued an Order to Show Cause as to why Plaintiffs should not be granted a Preliminary Injunction enjoining Defendant from , inter alia, "selling, purchasing, renting, reselling or otherwise distributing" the Products "within the North American Territory, as defined in the [Parties']

24

Agreement" or "developing and/or distributing software, . . . that is compatible with or connects to the LMP200 gas detector or the ABC station."  (Order to Show Cause, Ex. 1, ECF No. 5-1, <u>attached to</u> Motion for TRO.)   On January 11, 2023, in this action, Plaintiffs filed a motion seeking an order (1) enforcing the Order to Show Cause entered by the State Court; and (2) extending the return date of the TRO until a date upon which the Parties could be heard (hereafter the "TRO Motion").  (<u>See</u> Motion for TRO, ECF No. 5.)

On January 12, 2023, this case was reassigned to the undersigned.  (<u>See</u> Jan. 12, 2023 Elec. Order Reassigning Case.) On January 17, 2023, Defendant opposed Plaintiffs' TRO Motion. (<u>See</u> Opp'n to TRO, ECF No. 6.)   On January 18, 2023, the Court denied Plaintiffs' TRO Motion finding the State Court TRO had expired prior to Plaintiffs' TRO Motion in the Court, rendering Plaintiffs' request moot.  (<u>See</u> Jan. 18, 2023 Elec. Order Denying TRO Motion.)

On January 30, 2023, in accordance with a briefing schedule set by the Court, Plaintiffs filed a Motion for a Preliminary Injunction (hereafter the "PI Motion").  (<u>See</u> PI Motion, ECF No. 13.)   On March 13, 2023, Defendant opposed Plaintiffs' PI Motion.  (<u>See</u> Opp'n to PI Motion.)   In the interim, the parties engaged in mediation which returned unsettled.  (<u>See</u> Mar. 7, 2023 Elec. Report of Mediation Unsettled.)   A hearing on

25

Plaintiffs' PI Motion was held on March 24, 2023 with the only witness to testify being Stern. (See Min. Order for Proceedings, ECF No. 24.)  Ultimately, the Court denied Plaintiffs' PI Motion finding, inter alia, Plaintiffs had not demonstrated irreparable harm, or harm that could not be appropriately compensated for with an award of monetary damages.  (See Min. Order for Proceedings, ECF No. 25.)  Upon the denial of Plaintiffs' PI Motion, the Court set a briefing schedule on Defendant's anticipated Dismissal Motion.

On April 17, 2023, Defendant filed its initial dismissal motion in this case.  (See ECF No. 26.)  In response, Plaintiffs filed the FAC.  The FAC pleads five causes of action:

(1)  Breach of Contract as to the 2021 Agreement (Count One) (FAC ¶¶ 160-64);

(2)  Promissory Estoppel (Count Two) (id. ¶¶ 165-70);

(3)  Common Law Unfair Competition (Count Three) (id. ¶¶ 171-78);

(4)  Fraudulent Inducement as to the 2019 Agreement (Count Four) (id. ¶¶ 179-88); and

(5)  Tortious Interference with respective Economic Advantage (Count Five) (id. ¶¶ 189-202.)

In response, Defendant filed the present Dismissal Motion on May 26, 2023. (See generally Dismissal Motion; see also Support Memo, ECF No. 31.)  Plaintiffs filed their Opposition on

26

June 15, 2023 (Opp'n, ECF No. 32), to which Defendant replied on June 29, 2023.  (Reply, ECF No. 33.)


<u>DISCUSSION</u>

I.   <u>Legal Standard</u>

When considering a motion to dismiss under Rule 12(b)(6), the court must "accept as true all factual statements alleged in the complaint and draw all reasonable inferences in favor of the non-moving party."  <u>McCarthy v. Dun & Bradstreet Corp.</u>, 482 F.3d 184, 191 (2d Cir. 2007).  To survive a motion to dismiss under Rule 12(b)(6), a complaint must state "enough facts to state a claim to relief that is plausible on its face."  <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 570 (2007).

A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009).  Consequently, a complaint is properly dismissed where, as a matter of law, "the allegations in a complaint, however true, could not raise a claim of entitlement to relief."  <u>Twombly</u>, 550 U.S. at 558.  Similarly, a complaint is also properly dismissed "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct."  <u>Iqbal</u>, 556 U.S. at 679.  "Although all allegations contained in the complaint are presumed true" at the motion to dismiss stage,

27

"this principle is 'inapplicable to legal conclusions' or '[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements.'" <u>Szewczyk v. City of N.Y.</u>, No. 15-CV-0918, 2016 WL 3920216, at *2 (E.D.N.Y. July 14, 2016) (alteration in original) (quoting <u>Iqbal</u>, 556 U.S. at 678).

II.  <u>Analysis</u>

   A. <u>Documents the Court will Consider in Deciding Defendant's Dismissal Motion</u>

      As an initial matter, the Court must determine which documents, extraneous to the FAC, it may consider in deciding Defendant's Dismissal Motion.

      "If, on a motion under Rule 12(b)(6) . . . matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56 [and] [a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." FED. R. CIV. P. 12(d).  "For purposes of this rule, 'the complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference.'" <u>Chambers v. Time Warner, Inc.</u>, 282 F.3d 147, 152 (2d Cir. 2002) (quoting <u>Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.</u>, 62 F.3d 69, 72 (2d Cir. 1995)).  When a "document is not incorporated by reference, the court may nevertheless consider it where the complaint 'relies heavily upon its terms and effect,'

which renders the document 'integral' to the complaint." Id. at 153 (quoting Int'l Audiotext, 62 F.3d at 72). "However, 'even if a document is "integral" to the complaint, it must be clear on the record that no dispute exists regarding the authenticity or accuracy of the document.'" DiFolco v. MSNBC Cable L.L.C., 622 F.3d 104, 111 (2d Cir. 2010) (quoting Faulkner v. Beer, 463 F.3d 130, 134 (2d Cir. 2006)).

"Whether a document is attached to a complaint is [self-evident]." DeLuca v. AccessIT Grp., Inc., 695 F. Supp. 2d 54, 60 (S.D.N.Y. 2010) (citing Cortec Indus., Inc. v. Sum Holding L.P., 949 F.2d 42, 47 (2d Cir. 1991) (stating any written instrument attached as an exhibit to a complaint is deemed part of the pleadings)). "To be incorporated by reference, the complaint must make 'a clear, definite and substantial reference to the documents.'" Id. (quoting Helprin v. Harcourt, Inc., 227 F. Supp. 2d 327, 330-31 (S.D.N.Y. 2003)). However, "[l]imited quotation does not constitute incorporation by reference." McLennon v. City of N.Y., 171 F. Supp. 3d 69, 88-89 (E.D.N.Y. 2016) (quoting Looney v. Black, 702 F.3d 701, 716 n.2 (2d Cir. 2012)). Rather, to be integral to the complaint, a plaintiff must have: (1) "actual notice" of the extrinsic information; and (2) have "relied upon [the] documents in framing the complaint." Chambers, 282 F.3d at 153 (quoting Cortec Indus., 949 F.2d at 48). Indeed, "a plaintiff's reliance on the terms and effect of a document in

drafting the complaint is a necessary prerequisite to the court's consideration of the document on a dismissal motion." Id. (quoting Cortec, 949 F.2d at 47-48 (emphasis in original)).

Applying the aforementioned standard, in connection with the Dismissal Motion the Court finds it may consider the 2019 Agreement, and the 2021 Agreement, both of which are attached to the FAC. Furthermore, the Complaint incorporates by reference the March 4, 2021 email from Quinones to Stern in which Quinones allegedly accepted the terms of the 2021 Agreement on behalf of Heath (hereafter the "Quinones Email"). (See Quinones Email, Ex. D, ECF No. 30-4, attached to Deutsch Decl.) Given the FAC's reliance upon the Quinones Email in framing Count One of the FAC, together with the fact Plaintiffs clearly had notice of its contents due to their quotation of same, the Court will also consider said Email in connection with the Dismissal Motion.[4]

Defendant contends this Court may also consider Stern's testimony given during the Parties' contested preliminary injunction hearing, without converting the Dismissal Motion into one for summary judgment (see Support Memo, in toto (citing Stern's Hr'g Testimony in passim)), the Court declines to do so.[5]  See

_____

[4] Plaintiffs, likewise, do not dispute the authenticity of the Quinones Email. (See Opp'n at 1 n.2.)

[5] Likewise, the Court declines to consider the remainder of the evidence submitted as part of the parties' preliminary injunction

Carter v. Fagin, 363 F. Supp. 2d 661, 664 n.1 (S.D.N.Y. 2005) (declining to consider witness testimony presented as part of a preliminary injunction hearing on a motion to dismiss); but see Signorelli v. N.Y.S. Bd. of Elections, No. 95-CV-1026, 1995 WL 548712, at *5 (N.D.N.Y. Sept. 11, 1995) (converting defendants' motions to dismiss into motions for summary judgment where "[b]oth plaintiffs and defendants submitted affidavits and offered testimony at [a] preliminary injunction hearing" and the court opted to consider this evidence in resolving the motions); Calo v. Paine, 385 F. Supp. 1198, 1200 (S.D.N.Y. 1974) (finding where "testimony was presented at the hearing on plaintiff's motion for a preliminary injunction and other materials, including affidavits of the defendants, were submitted by the defendants and not objected to by the plaintiff, the motion [would] be treated as one for summary judgment."), vacated and remanded on other grounds, 521 F.2d 411 (2d Cir. 1975).

      B. Breach of the 2021 Agreement (Count One)

"To prevail on a breach-of-contract claim in New York, a plaintiff must prove: '(1) the existence of a contract, (2) performance by the party seeking recovery, (3) nonperformance by the other party, and (4) damages attributable to the breach.'" Moreno-Godoy v. Kartagener, 7 F.4th 78, 85 (2d Cir. 2021) (quoting

---

hearing since, to do so, the Court would be required to convert the present motion into a motion for summary judgment.

RCN Telecom Servs., Inc. v. 202 Ctr. St. Realty LLC., 156 F. App'x 349, 350-51 (2d Cir. 2005)); see also Empire Fire and Marine Ins. Co. v. Edge Auto, Inc., No. 21-CV-5413, 2022 WL 17779117, at *4 (E.D.N.Y. Sept. 15, 2022) (same).  A valid contract requires "a manifestation of mutual assent sufficiently definite to assure that the parties are truly in agreement with respect to all material terms." Cohen v. Avanade, Inc., 874 F. Supp. 2d 315, 320 (S.D.N.Y. 2012) (quoting Express Indus. and Terminal Corp. v. N.Y.S Dep't of Transp., 93 N.Y.2d 584, 589 (1999)).

Defendant argues the 2021 Agreement is not an enforceable contract; Defendant's argument in this regard is threefold.  First, Defendant contends the 2021 Agreement was not signed by Heath, the party against whom enforcement is sought, thus, the Agreement violates the Statute of Frauds contained in New York's Uniform Commercial Code (the "UCC").  Next, Defendant argues since the 2021 Agreement is for a term lasting longer than one year, it is violative of the Statute of Frauds contained in the General Obligations Law (the "GOL").  (See Support Memo at 5.) Finally, Defendant avers even if the unsigned 2021 Agreement were not violative of the Statute of Frauds, it would still not be an enforceable contract as it lacks material terms.  (Id. at 9.)  The Court addresses each argument in turn.

1. <u>The 2021 Agreement is a Contract for the Sale of Goods; therefore, the U.C.C. Applies to its Terms</u>[6]

As an initial matter, both parties agree the UCC applies to the 2021 Agreement since, if it is a contract at all, it is a contract that is predominantly for the sale of goods for more than $500.[7]  (<u>See</u> Support Memo at 4 n.2 ("The U.C.C. is applicable here"); <u>see also</u> Opp'n at 6 n.4.)  <u>See</u> <u>E. Mishan & Sons, Inc. v. Homeland Housewares, LLC</u>, No. 10-CV-4931, 2012 WL 2952901, at *4 (S.D.N.Y. July 16, 2012) ("Even where the contract at issue is a distributorship agreement, it is governed by the UCC if it is predominantly for the sale of goods.") (citing <u>Marbelite Co. v. Nat'l Sign and Signal Co.</u>, 2 F. App'x 118, 120 (2d Cir. 2001)); <u>see also</u> <u>Alessi Equip., Inc. v. Am. Piledriving Equip., Inc.</u>, 578 F. Supp. 3d 467 (S.D.N.Y. 2022) ("[N]umerous courts within this Circuit have determined that 'exclusive dealership or

_____

[6] To the extent Defendant argues the 2021 Agreement is also for a term lasting longer than one year and, consequently, is also violative of GOL Section 5-701, the Court agrees with Plaintiffs that the FAC adequately pleads facts plausibly alleging that Heath may have signed the Agreement and, likewise, it is reasonable to infer Heath has said Agreement in its possession.  (<u>See</u> FAC ¶¶ 100-05.)  Additionally, as discussed <u>infra</u>, the FAC plausibly alleges that the Quinones Email is a signed writing that is sufficient to satisfy the Statute of Frauds.  Therefore, the Court declines to dismiss Plaintiffs' breach of contract claim on this basis.  This does not preclude Defendant from arguing why the GOL should apply to Plaintiffs' claims at a subsequent stage of this litigation.

[7] The FAC pleads facts which, accepted as true, establish that the 2021 Agreement contemplated the sale of goods worth more than $500. (<u>See e.g.</u>, ¶¶ 116-18, 131-32.)

distributorship arrangements' involving the sale of complex equipment in specific geographic territories . . . are 'predominantly for the sale of goods' and thus, subject to the U.C.C.") (collecting Cases)). Consequently, the Court applies the UCC to the parties' claims.  See <u>ABA Refinery Corp. v. Republic Metals Refin. Corp.</u>, No. 15-CV-8731, 2017 WL 4481170, at *4 n.3 (S.D.N.Y. Oct. 5, 2017) (Applying the UCC to the parties' claims where their briefs cited to the UCC as the controlling body of law and noting that "the Second Circuit has explained, where '[t]he parties' briefs assume' that a certain body of law controls, 'such implied consent is sufficient to establish choice of law.'" (quoting <u>Krumme v. WestPoint Stevens Inc.</u>, 238 F.3d 133, 138 (2d Cir. 2000))).

2. <u>Application of the Statute of Frauds</u>

The UCC Statute of Frauds is contained in Section 2-201(1) of the N.Y. UCC and states:

> Except as otherwise provided in this section[,] a contract for the sale of goods for the price of $500 or more is not enforceable by way of action or defense unless there is some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought or by his authorized agent or broker.

"This provision 'simply requir[es] "that the writing afford a basis for believing that the offered oral evidence rests on a real transaction."'" <u>Rienzi & Sons, Inc. v. I Buonatavola Sini S.R.L.</u>,

No. 20-CV-5704, 2021 WL 5013795, at *3 (E.D.N.Y. Oct. 28, 2021)

(quoting Bazak Int'l Corp. v. Mast. Indus., Inc., 73 N.Y.2d 113,

120 (1989)).

> i.   The Confirmatory Writings Exception to the
>      Statute of Frauds

The UCC Statute of Frauds contains certain exceptions by

which an unsigned contract may, nevertheless, be enforceable.

First, the Merchant's Exception contained in Section 2-201(2).

The Merchant's Exception provides:

> Between merchants if within a reasonable time
> a writing in confirmation of the contract and
> sufficient against the sender is received and
> the party receiving it has reason to know its
> contents, it satisfies the requirements of
> subsection (1) against such party unless
> written notice of objection to its contents is
> given within 10 days after it is received.

"There are no rigid requirements as to the form or content of a

confirmatory writing." Antifun Ltd. T/A Premium Vape v. Wayne

Indus. LLC, 616 F. Supp. 3d 291, 307-08 (S.D.N.Y. July 22, 2022)

(quoting Hilord Chem. Corp. v. Ricoh Elecs., Inc., 875 F.2d 32, 37

(2d Cir. 1989)).  Indeed, "[a] writing is sufficient so long as it

affords a basis for believing that it reflects a real transaction

between the parties." Id.

Plaintiffs contend the Merchant's Exception applies in

this case (opp'n at 2-3), specifically, that their "return to Heath

of the signed Agreement, and the March 4, 2021 emails, sent by"

Quinones "constitute Heath's confirmation of the terms of the

Agreement, thereby creating an enforceable agreement between the parties." (Id. at 3.)  Defendant refutes Plaintiffs' contentions and argues Plaintiffs have failed to "plausibly allege that the 2021 Draft" was signed by Heath as required by N.Y. UCC Section 2-201(1).  (Support Memo at 4.)

Courts in this circuit have found that "[e]lectronic communications between merchants—provided that they are sufficiently precise—can . . . serve as writings confirming an agreement." Antifun Ltd. T/A Premium Vape, 616 F. Supp. 3d at 308 (citing E. Mishan & Sons, Inc., 2012 WL 2952901, at *5); see also Bazak Intern. Corp., 378 F. Supp. 2d at 383-86; Henry Avocado Corp. v. Z.J.D. Brother, LLC, No. 17-CV-4559, 2019 WL 1586865, at *11 n.10 (E.D.N.Y. Apr. 12, 2019) (noting an email containing an "electronic signature[] . . . satisf[ies] the merchant's exception to the statute of frauds").

Here, on March 3, 2021, Stern emailed Quinones a copy of the 2021 Agreement.  On March 4, 2021, Quinones replied "it was a pleasure talking to you yesterday.  I have reviewed the changes, and the proposed insertions are acceptable.  Please sign and return at your earliest convenience." (Quinones Email (emphasis added).) The Quinones Email contains an electronic signature block stating her name, title, and contact information.  (Id.)  The Court finds that, considering the above-mentioned case law, Quinones' electronic signature suffices to qualify as a signed writing as it

36

is arguably a manifestation of Quinones' intent to authenticate the email transmission.  Cf. Kokirtsev v. Wells Fargo Nat'l Ass'n, No. 12-CV-6056, 2014 WL 3888301, at *3 n.2 (E.D.N.Y. Feb. 3, 2014) (stating, under the GOL "[a] name or other symbol attached to a piece of paper with an intent to authenticate it creates a valid signature", and that "[t]he use of an electronic signature shall have the same validity and effect as the use of a signature affixed by hand."); see also In re 4Kids Ent., Inc., 463 B.R. 610, 693 (S.D.N.Y. Bankr. 2011) (stating an "[e]mail communication evidencing an agreement to modify the terms of an agreement constitutes a 'signed writing' as per the statute of frauds, where (1) the terms of the proposed modification are set forth in the email; (2) a reply email evidences acceptance of the proposed modification; and (3) the emails include signature blocks, which signify an intent to authenticate"); R.D. Weis & Co., Inc. v. The Children's Place Retail Stores, Inc., No. 08-CV-4245, 2008 WL 4950962, at *4 n.2 (S.D.N.Y. Nov. 19, 2008) ("[T]he electronic signatures at the bottom of the e-mails may qualify as signed writings by [defendant] [since] Courts have held that a typed signature in an e-mail can qualify as a signed writing.").  In view of the foregoing, the FAC plausibly alleges that the Quinones Email was a confirmatory writing and that the Merchant's Exception to the statute of frauds applies in Plaintiffs' case.  The Court next turns to whether the FAC alleges facts sufficient to allege

that Quinones had the apparent authority to bind Heath to the 2021 Agreement.

### ii. Quinones' Apparent Authority to Bind Heath to Terms of 2021 Agreement

"An agent can bind a principal by virtue of the agent's actual or apparent authority to act on the principal's behalf." Richmond v. Montefiore Med. Ctr., No. 21-CV-8700, 2023 WL 6216271, at *15 (S.D.N.Y. Sept. 25, 2023.)  Apparent authority exists when "from the 'written or spoken words or any other conduct of the principal which, reasonably interpreted, causes [a] third person to believe that the principal consents to have [an] act done on his behalf by the person purporting to act for him." Minskoff v. Am. Exp. Travel Related Servs. Co., 98 F.3d 703, 708 (2d Cir. 1996) (quoting RESTATEMENT (SECOND) OF AGENCY 27 (1958)).  "An employee's title alone can indicate [apparent] authority."  Merrill Lynch Cap. Servs., Inc. v. UISA Fin., No. 09-CV-2324, 2012 WL 1202034, at *18 (S.D.N.Y. Apr. 10, 2012) (citing Goldston v. Bandwidth Tech. Corp., 52 A.D.3d 360 (1st Dep't 2008)).  "'[T]he existence of "apparent authority" depends upon a factual showing that the third party relied upon the misrepresentations of the agent because of some misleading conduct on the part of the principal - not the agent.'"  Montefiore Med. Ctr., 2023 WL 6216271, at *16 (quoting Hallock v. State, 64 N.Y.2d 224, 231 (1984)).  "[A] third party with whom the agent deals may rely on an appearance of authority

only to the extent that such reliance is reasonable." Id. Consequently, "[t]o survive a motion to dismiss, a plaintiff must allege facts, which, if proved, would show that the plaintiff 'reasonably believed that [the agent] entered into the agreement with [the plaintiff] on behalf of [the principal]." Buffalo Xerographix, Inc. v. Hartford Ins. Grp., 540 F. Supp. 3d 382, 392 (W.D.N.Y. 2021) (alterations in original). "The existence of apparent authority is normally a question of fact." Id.

To the extent Plaintiffs argue the Quinones Email suffices to bind Heath to the terms of the 2021 Agreement, Defendant demurs. (Support Memo, at 7-9.) Defendant asserts Plaintiffs cannot plausibly argue that Quinones had the authority to bind Heath to the contract because Plaintiffs were on notice "from the 2019 Agreement that a 'duly authorized' Heath representative countersigns distribution agreements that Heath enters into." (Id. at 7.) Defendant highlights that the 2019 Agreement was signed by Wehnert "on February 1, 2019", and returned to Plaintiffs "after . . . Stern first executed it on January 29, 2019." (Id.) Moreover, Defendant emphasizes Plaintiffs' concession that Stern was never affirmatively told that Quinones was either an attorney or had the authority to bind Heath to the 2021 Agreement.[8] (Id.) Defendant points to Stern's sworn

---

[8] The Court has already determined that it will not consider the Preliminary Injunction Hearing testimony in deciding the Dismissal

testimony that he assumed Quinones had authority.  (Id.)  Defendant avers further that Quinones' email to Plaintiffs during the contract negotiations "do no more than indicate that she was aiding [] Sims in the review process."  (Id. at 8.)

Here, the FAC pleads that Sims held Quinones out to have the apparent authority to accept and finalize the 2021 Agreement based upon her involved role in negotiating and reviewing Plaintiffs' redlines of the 2021 Agreement.  (FAC ¶ 101.) Specifically, the FAC alleges, inter alia, Sims "directed Stern to speak directly with Quinones" regarding the 2021 Agreement and proposed revisions, and that Sims had held Quinones "out as the individual in charge of negotiating and finalizing Heath's contracts."  (Id. ¶¶ 90-91.)  The FAC further alleges that Stern believed Quinones was Heath's General Counsel based upon her title of "Manager of Legal" and that, at Sims' direction, Stern and Quinones engaged in telephone discussions in March of 2023, in which they, negotiated and finalized the 2021 Agreement.  (Id.) Drawing all reasonable inferences in Plaintiffs' favor, the Court finds Sims' representations to Stern that revisions to the 2021 Agreement should be sent to both Sims and Quinones "to review",

---

Motion.  Nevertheless, even if it were to consider the testimony, Stern's admission that nobody affirmatively told him Quinones was an attorney does not automatically foreclose the possibility that the FAC cannot plausibly allege Heath held Quinones out to have apparent authority through other acts.

together with Quinones' title, and her central role in reviewing and negotiating the 2021 Agreement, suffices at this stage to plausibly plead the existence of apparent authority. Moreover, given that the reasonableness of Sterns' reliance is likely a question of fact, at the motion to dismiss stage the Court cannot find that Stern's reliance was unreasonable as a matter of law.

In sum, the Court finds the Quinones Email replying to Stern's email which attached the 2021 Agreement, and which affirmed Quinones' review and acceptance of Stern's revisions, plausibly suffices as a confirmatory writing based upon the electronic signature block (see supra Part II.B.2.i.). The Court also finds the FAC pleads sufficient facts to allege that Quinones had the apparent authority to enter into the 2021 Agreement on Heath's behalf. "However, although the merchant exception allows [plaintiffs] to proceed with their breach of contract claim despite the Statute of Frauds, it does not establish that there was mutual assent to the terms [of the 2021 Agreement], as a matter of law." See Atronic Int'l., GmbH v. SAI Semispecialists of Am., Inc., No. 03-CV-4892, 2006 WL 2654827, at *5 (E.D.N.Y. Sept. 15, 2006). Consequently, the Court turns to the parties' mutual assent arguments next.

3. <u>Whether the 2021 Agreement is Missing Essential Terms</u>

"To create a binding contract, 'there must be a manifestation of mutual assent sufficiently definite to assure that the parties are truly in agreement with respect to all material terms.'" <u>Demand Elec., Inc. v. Innovative Tech. Holdings, LLC</u>, 665 F. Supp. 3d 498, 504 (S.D.N.Y. 2023) (quoting <u>Express Indus. & Terminal Corp. v. N.Y.S Dep't of Transp.</u>, 93 N.Y.2d 584, 589 (1999)). Under the UCC, "[a] contract for [the] sale of goods may be made in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of such a contract." <u>Id.</u> at 505 (citing N.Y. UCC § 2-204(1) (alteration in original)). This is a relatively liberal standard "and does not require every contractual term to be spelled out in detail." <u>Id.</u> (quoting <u>Dell's Maraschino Cherries Co., Inc. v. Shoreline Fruit Growers, Inc.</u>, 887 F. Supp. 2d 459, 471 (E.D.N.Y. 2012)). Where a contract is for the sale of goods, "the essential terms are quantity, price, and time and manner of delivery." <u>Alessi Equip., Inc.</u>, 578 F. Supp. 3d at 495 (quoting <u>Fakhoury Enters., Inc. v. J.T. Distrib.</u>, No. 94-CV-2729, 1997 WL 291961, at *3 (S.D.N.Y. June 2, 1997)). However, where the parties to a contract fail to specify either a time, price, and/or manner-of-delivery term, a contract is not necessarily unenforceable since "the U.C.C.'s 'gap filling' provisions supply 'a reasonable time' for shipment or

delivery; 'a reasonable price at the time of delivery;' and 'the seller's place of business . . . [,] [the seller's] residence' or any other location of the goods known by the parties" for the manner-of-delivery.  Id. (citing N.Y. UCC §§ 2-305(1); 2-308; 2-309(1)).  Additionally, "[a] lawful agreement . . . for exclusive dealing in the kind of goods concerned imposes[,] unless otherwise agreed[,] an obligation by the seller to use best efforts to supply the goods and by the buyer to use best efforts to promote their sale."  Id. (quoting N.Y. UCC § 2-306 & cmt.5) (alteration in original).  "Thus, the absence of a quantity term in an alleged exclusive distributorship contract . . . does not make an otherwise valid contract invalid."  Id. (citing Mega Tech Int'l Corp. v. Miller Elec. Mfg. Co., No. 97-CV-1085, 1997 WL 790750, at *3 (S.D.N.Y. Dec. 23, 1997)); cf Chartwell Therapeutics Licensing LLC v. Citron Pharma LLC, No. 16-CV-3181, 2019 WL 12518722, at *5 (E.D.N.Y. Sept. 4, 2019) ("New York law recognizes a[n] 'exclusive dealing' exception to the quantity rule.").

        Defendant highlights that the 2021 Agreement lacks certain "material terms" including price, delivery terms, and insurance terms.  (See Support Memo at 9-10.)  However, despite confirming that the UCC was applicable to the 2021 Agreement it

has failed to address the applicability of the UCC's gap filling provisions to the 2021 Agreement.[9]

Plaintiffs highlight that the UCC's gap filling provisions supply many of the terms which Defendant highlights are missing, including price; time and place of delivery; and quantity. (Opp'n at 6.)  Plaintiffs state that the inquiry the Court should engage in is to "determine whether the parties intended to make a contract despite leaving these terms open, and whether any dispute over any of the terms undermines such an intent to be bound." (Id. (quotation marks and citation omitted).).  Plaintiffs maintain an examination of the Parties' conduct highlights "there was absolutely no dispute with regards to the price, insurance, and time and place of delivery." (Id. at 7.)  Plaintiffs emphasize that operation under the 2021 Agreement was consistent with the Parties' conduct under the 2019 agreement in that price fluctuated and was based upon volume and timing of orders, and that City Calibration "maintained insurance acceptable to Heath and had already been provided with Heath's insurance requirements." (Id. at 7-8.)

Here, contrary to Defendant's contentions, the 2021 Agreement is not unenforceable for want of price, time, delivery,

___

[9] Indeed, Defendant's Reply on this issue focuses primarily on caselaw applying the GOL, despite Defendant's previous acknowledgment that the UCC also applies to the 2021 Agreement.

or quantity terms because the UCC's gap filling provisions can provide them. Plaintiffs are correct in their assertion that the issue for the Court to determine is the extent to which the omission of these terms reflects that the parties did not intend to be bound.

In determining whether two parties have formed a contract, the court looks "not to the[] [parties'] 'after-the-fact professed subjective intent, but their objective intent as manifested by their expressed words and deeds at the time'" of contracting. Blake v. Fiit Int'l., Inc., No. 05-CV-6150, 2007 WL 980362, at *6 (S.D.N.Y. Mar. 30, 2007) (quoting Stetson v. Duncan, 707 F. Supp. 657, 666 (S.D.N.Y. 1988)); see also Antifun Ltd. T/A Premium Vape, 616 F. Supp. 3d at 305 ("In determining whether the parties entered into a contractual agreement . . . , it is necessary to look . . . to the objective manifestations of the intent of the parties as gathered by their expressed words and deeds.") (citation omitted); Asesores y Consejeros Aconsec CIA, S.A. v. Glob. Emerging Mkts. N.A., Inc., 841 F. Supp. 2d 762, 767 (S.D.N.Y. 2012) ("[I]f a party's objective actions support the conclusion that he accepted an agreement, he will be bound to it even if he never subjectively assented to the terms of the agreement."). Where the parties' "expressions and conduct would lead a reasonable person to conclude that they intended to reach

45

a binding agreement, the agreement is enforceable." <u>Kaplan v.</u>
<u>Vincent</u>, 937 F. Supp. 307, 312 (S.D.N.Y. 1996).

Here, the FAC plausibly pleads facts sufficient to
survive Defendant's Dismissal Motion.  Specifically, the Court
finds the Quinones Email in which Quinones informed Plaintiffs
their revisions were "acceptable" and asked them to sign and return
the Agreement, together with the FAC's allegation that Sims
contacted Stern to congratulate him on closing the deal,
cumulatively reflect an outward manifestation of intent by Heath
to be bound by the terms of the 2021 Agreement.[10]  Likewise, the
allegations in the FAC that the parties performed under the 2021
Agreement for a year, and that Heath held itself out to be City
Calibration's partner lends further credence to Heath's intent to
be bound.  As to the open terms, Plaintiffs' FAC plausibly alleges
that there was no dispute as to what these terms would be because
the Parties' intention was to continue adhering to the practices
that they had developed under the 2019 Agreement.  <u>See</u> <u>Vinifera</u>
<u>Imps. Ltd. v. Societa Agricola Castello Romitorio SRL</u>, No.
16-CV-0103, 2020 WL 1184962, at *5 (E.D.N.Y. Mar. 12, 2020) ("In
determining the intention of the contracting parties, it is proper

---

[10] The Court also agrees with Plaintiffs insofar as the FAC also
pleads facts sufficient to plausibly allege that Sims had actual
authority to bind Heath to the 2021 Agreement.  Likewise, the FAC
plausibly alleges facts sufficient to allege Sims' outward
manifestations of intent indicated his acceptance of the 2021
Agreement.

to consider matters outside the writings, including the previous dealings between the parties and the practices of the trade." (quoting Paper Corp. of U.S. v. Schoeller Tech. Papers, Inc., 807 F. Supp. 337, 347 (S.D.N.Y. 1992) (internal quotations omitted))).

Thus, Defendant's motion to dismiss Plaintiffs' Breach of Contract Claim is denied.

C. Promissory Estoppel As to 2021 Agreement (Count Two)

In order to plead a promissory estoppel claim under New York law, a plaintiff must prove three elements: (1) "a clear and unambiguous promise"; (2) "reasonable and foreseeable reliance on that promise"; and (3) "injury to the relying party as a result of the reliance." Lamda Sols. Corp. v. HSBC Bank USA, N.A., 574 F. Supp. 3d 205, 214 (S.D.N.Y. 2021) (quoting Kaye v. Grossman, 202 F.3d 611, 615 (2d Cir. 2000)). "The existence of a valid and enforceable written contract governing a particular subject matter ordinarily precludes recovery in quasi-contract for events arising out of the same subject matter." Dart Brokerage Corp. v. Am. Com. Ins. Co., No. 13-CV-4014, 2013 WL 5966901, at *2 (S.D.N.Y. Nov. 7, 2013) (quoting Clark-Fitzpatrick, Inc. v. Long Island R.R. Co., 70 N.Y.2d 382, 388 (1987) (alteration omitted)). However, "it is also well-established that plaintiffs who allege the existence of a valid contract may nonetheless plead the alternative theories of promissory estoppel and breach of contract when the defendant does not concede the enforceability of such contract." Lamda Sols.,

Corp., 574 F. Supp. 3d at 214 (quoting Pers. Watercraft Prod. SARL v. Robinson, No. 16-CV-9771, 2017 WL 4329790, at *11 (S.D.N.Y. Sept. 1, 2017)).

"A claim for promissory estoppel may not be maintained under New York law where the alternative claim for breach of contract is barred by the Statute of Frauds, unless the circumstances make it unconscionable to deny the promise upon which the plaintiff relied." United Mag. Co. v. Murdoch Mag. Distrib., Inc., 146 F. Supp. 2d 385, 405 (S.D.N.Y. 2001). "To satisfy the 'unconscionable injury' threshold, Plaintiff 'must demonstrate injuries beyond those that flow naturally from the defendant's non-performance or from the plaintiff's continuing performance of the unenforceable agreement.'" Darby Trading, Inc. v. Shell Intern. Trading and Shipping Co. Ltd., 568 F. Supp. 2d 329, 341 (S.D.N.Y. 2008) (quoting Mobile Data Shred, Inc. v. United Bank of Switz., No. 99-CV-10315, 2000 WL 351516. at *4 (S.D.N.Y. Apr. 5, 2000)). "[I]n the absence of 'egregious' circumstances, courts have consistently rejected promissory estoppel claims when the alleged injuries consisted of lost profits, lost fees, forgone business opportunities or damage to business reputation." Bd. of Managers of Trump Tower at City Ctr. Condo. by Neiditch v. Palazzolo, 346 F. Supp. 3d 432, 470 (S.D.N.Y. 2018) (quoting Komlossy v. Faruqi & Faruqi, LLP, No. 15-CV-9316, 2017 WL 722033, at *8 (S.D.N.Y. Feb. 23, 2017)).

Plaintiffs acknowledge that their promissory estoppel claim was pled with the intention that the Court apply promissory estoppel "[i]n the event the Court determines the Statute of Frauds applies". (Opp'n at 11.) Consequently, to plead in the alternative a viable promissory estoppel claim, New York law requires Plaintiffs to demonstrate unconscionable injury. Plaintiffs argue they have demonstrated unconscionable injury by pleading facts which demonstrate they have suffered, inter alia, "the near total loss of City Calibration's business, the complete loss of the time and money spent developing a smart app to pair with the Products, the loss of City Calibration and Platsky's customer goodwill . . . and the loss of opportunity to develop City Calibration's business on Long Island." (Id. at 16-17 n.8.)

Here, none of the injuries pled rise to the level of unconscionable injury because, as aptly highlighted by Defendant, the damages caused by such injuries "flow naturally from the breach of the" 2021 Agreement. Courts in this District have found that damages of the kind pled here do not suffice to establish unconscionable injury sufficient to maintain a promissory estoppel claim. See Darby Trading, 568 F.Supp.2d at 341, (finding "injuries, consisting of lost clients and lost opportunities, while perhaps significant to Plaintiff, are most aptly described as the expectation damages of [] non-performance of the [parties'] . . . agreement"); N. Am. Knitting Mills, Inc. v. Int'l

49

Women's Apparel, No. 99-CV-4643, 2000 WL 1290608, at *3 (S.D.N.Y. Sept.12, 2000) (finding no unconscionable injury where plaintiff pled it had "incurred substantial expenses to upgrade its operating capacity and lost other substantial clients" since such injury "flows naturally from defendant's non-performance of the alleged agreement"); Ellis v. Provident Life & Accident Ins. Co., 3 F. Supp. 2d 399, 411 (S.D.N.Y. 1998) ("[I]t is well established under New York law that injuries resulting in a[ ] . . . decision to forgo other career opportunities do not constitute unconscionable injuries."); Schoeller Tech. Papers, 724 F. Supp. at 118-19 (S.D.N.Y. 1989) (finding that making investments in plant and capital equipment, increasing payroll and foregoing other business opportunities does not constitute unconscionable injury.)

Accordingly, Plaintiffs may not invoke promissory estoppel to overcome application of the N.Y. UCC and/or GOL Statute of Frauds should their breach of contract claim fail post-discovery.[11]

---

[11] To the extent Plaintiffs liken their case to the facts in Cyberchron Corporation v. Calldata Systems Development, Inc., 47 F.3d 39 (2d Cir. 1995), the Court is unconvinced. As an initial matter, the FAC is wholly devoid of facts supporting Plaintiffs' contention that Defendant "continually pressured Plaintiffs to purchase more Product"; this alone differentiates the facts in the case at bar from those in Cyberchron.

D. Fraudulent Inducement as to the 2019 Agreement (Count Four) [12]

1. The 2019 Choice-of-Law Clause

As a threshold matter, the Court must determine which States' law, New York or Texas, applies to Plaintiffs' fraudulent inducement claim.  Plaintiffs argue Texas law should apply because the 2019 Agreement contains a Texas choice-of-law provision. (Opp'n at 19.)  The Court disagrees.

"Under New York law, a choice-of-law provision indicating that the contract will be governed by a certain body of law does not dispositively determine that law which will govern a claim of fraud arising incident to the contract."  Yak v. Bigger Pockets, L.L.C., No. 20-CV-3498, 2022 WL 67740, at *3 (2d Cir. Jan. 7, 2022) (quoting Krock v. Lipsay, 97 F.3d 640, 645 (2d Cir. 1996)).  To that end, "[u]nder New York law, . . . tort claims are outside the scope of contractual choice-of-law provisions that specify what law governs construction of the terms of the contract".  Fin. One Public Co. Ltd. V. Lehman Bros. Special Fin., Inc., 414 F.3d 325, 355 (2d Cir. 2005).  While "a contractual choice-of-law clause could be drafted broadly enough to reach such tort claims", id., "New York courts have shown 'reluctance to read choice-of-law clauses broadly.'"  Ramiro Aviles v. S & P Glob.,

---

[12] The Fraudulent Inducement Claim is the only claim Plaintiffs bring in connection with the 2019 Agreement.

Inc., 380 F. Supp. 3d 221, 270 (S.D.N.Y. 2019). Generally, "provisions applying to disputes 'arising out of' or 'relating to' a contract are capacious enough to reach related tort claims, while provisions stating that a contract will be 'governed by' or 'construed in accordance with' the law of a state are not." Chigirinskiy v. Panchenkova, No. 14-CV-4410, 2015 WL 1454646, at *6 (S.D.N.Y. Mar. 31, 2015) (quoting Refco Grp. Ltd., LLC v. Cantor Fitzgerald, L.P., No. 13-CV-1654, 2014 WL 2610608, at *40 (S.D.N.Y. June 10, 2014)).

Here, Plaintiffs' fraudulent inducement claim sounds in tort, not contract. See Yookel, Inc. v. U.S. Steel Corp., 2022 WL 542379, at *4 (E.D.N.Y. Feb. 23, 2022) (stating a fraudulent inducement claim is a claim which does not "sound in contract" and was thus "not governed by the . . . Agreement's choice of law provision"); see also Dessert Beauty, Inc. v. Platinum Funding Corp., No. 06-CV-2279, 2006 WL 3780902, at *5 (S.D.N.Y. Dec. 26, 2006) ("[T]he choice of law provision does not determine which state's law should apply to the tort claim [for fraudulent inducement]."). Moreover, the 2019 Agreement's choice-of-law provision is akin to the narrow provisions which New York courts hold are not broad enough to reach related tort claims.[13] Compare

---

[13] The 2019 Agreement's choice-of-law provision is in Section 12(k) and reads: "This Agreement shall be governed and interpreted in accordance with the laws of the State of Texas. Venue of any dispute shall lie in Harris County, Texas."

Ramiro Aviles, 380 F. Supp. 3d at 271 (finding choice-of-law provision that read "[t]his Agreement shall be governed by, and construed in accordance with, the laws of the State of New York . . . fits to a tee the sort of contractual language that courts applying New York law have held insufficient to cover tort claims"); and Knieriemen v. Bache Halsey Stuart Shields Inc., 74 A.D.2d 290, 293 (1st Dep't 1980) (finding, where contract contained choice-of-law clause which "recited that '[t]his contract shall be governed by the laws of the State of New York'", such clause was not broad enough to encompass tort claims), with Turtur v. Rothschild Registry Intern., Inc., 26 F.3d 304, 309-10 (2d Cir. 1994) (rejecting appellant's contention that the choice-of-law claim in the at-issue agreement did not apply to fraud claim because the fraud claim sounded in tort where appellants had "agreed to be bound by a choice of law provision that covers any controversy 'arising out of or relating to' the subscription").

In view of the foregoing, the Court finds the choice-of-law provision in the 2019 Agreement does not apply to Plaintiffs' fraudulent inducement claim.

## 2. Choice of Law Analysis

A federal Court "sitting in diversity jurisdiction must apply the law of the forum state to determine the choice-of-law."[14]

---

[14] The basis for removing this case from the State Court to this Court was the existence of diversity jurisdiction since "both

Fieger v. Pitney Bowes Credit Corp., 251 F.3d 386, 393 (2d Cir. 2001) (citing Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 497 (1941)).  "Typically, New York courts apply New York's substantive law to cases filed in New York." Ramiro Aviles, 380 F. Supp. 3d at 271 (citing Wall v. CSX Transp., Inc., 471 F.3d 410, 415 (2d Cir. 2006)).  However, "where a party has identified a conflict between New York's tort law and the tort laws of another relevant jurisdiction, a New York court will apply '[t]he law of the jurisdiction having the greate[r] interest in the litigation.'" Id. (quoting GlobalNet Financial.com, Inc. v. Frank Crystal & Co., 449 F.3d 377, 383 (2d Cir. 2006)).  Where the parties are domiciled in different states, "the locus of the tort will almost always be determinative in cases involving conduct-regulating laws." Yookel, Inc., 2022 WL 542379, at *4 (quoting Chigirinskiy, 2015 WL 1454646, at *6 n.7); see also H.S.W. Enters., Inc. v. Woo Lae Oak, Inc., 171 F. Supp. 2d 135, 142 (S.D.N.Y. 2001) (same).  "New York courts consider the locus of a fraud to be the place where the injury was inflicted and not the place where the fraudulent act originated." Id. (quoting H.S.W. Ents., Inc., 171 F. Supp. 2d at 142).

---

plaintiffs are New York corporations with their principal places of business in the State of New York" and the "sole defendant is a Delaware corporation with its principal place of business in the State of Texas."  (See Notice of Removal at 1.)

Here, Platsky is a New York-based domiciliary which maintains its principal place of business in New York. (See FAC ¶ 17.) The 2019 Agreement is a distribution contract in which Platsky contracted to purchase and sell products from Defendant for distribution in the New York Metropolitan Area market, to New York LMPs. (See 2019 Agreement, Ex. A.) New York is the locus of Plaintiffs' injury; therefore, New York law applies to their fraudulent inducement claim.

### 3. Fraudulent Inducement[15]

"To state a claim for fraudulent inducement under New York law, a plaintiff must allege: '(1) a material misrepresentation or omission that induced the party to sign the contract; (2) scienter; (3) reliance; and (4) injury.'" Centauro Liquid Opportunities Master Fund, L.P. v. Bazzoni, No. 15-CV-9003,

---

[15] The Court acknowledges that the 2019 Agreement contains a merger clause and, as highlighted by Defendant, that there are instances in which a merger clause forecloses a fraudulent inducement claim. However, such clauses generally must "state[] that a contracting party disclaims the existence of or reliance upon [a] specified representation." Mfrs. Hanover Tr. Co. v. Yanakas, 7 F.3d 310, 315 (2d Cir. 1993) (citing Citibank, N.A. v. Plapinger, 66 N.Y.2d 90, 94-95 (1985)). The general rule is that "'an omnibus statement that the written instrument embodies the whole agreement, or that no representations have been made' is insufficient to bar a claim of fraudulent inducement." PetEdge, Inc., 234 F. Supp. 3d at 488 (quoting Mfrs. Hanover Tr. Co., 7 F.3d at 315). The Court finds that the merger clause contained in the 2019 Agreement is more akin to a standard omnibus statement which does not identify the specific representations upon which Plaintiffs' fraudulent inducement claim is premised. Notwithstanding this finding, the Court finds Plaintiffs have failed to adequately plead scienter as to their fraud claim.

2017 WL 3726754, at *4 (S.D.N.Y. Aug. 28, 2017) (quoting <u>Davidowitz</u> <u>v. Patridge</u>, No. 08-CV-6962, 2010 WL 5186803, at *7 (S.D.N.Y. Dec. 7, 2010)).

Additionally, fraud claims are evaluated with reference to the heightened pleading standards established by Federal Rule of Civil Procedure 9(b).  Rule 9(b) "places 'two further burdens on fraud plaintiffs—the first goes to the pleading of the circumstances of the fraud, the second to the pleading of the defendant's mental state.'"  <u>Id.</u> at *5 (quoting <u>Loreley Fin.</u> <u>(Jersey) No. 3 Ltd. V. Wells Fargo Sec., LLC</u>, 797 F.3d 160, 171 (2d Cir. 2015)); <u>see also</u> <u>Nakahata v. N.Y.-Presbyterian Healthcare</u> <u>Sys. Inc.</u>, 723 F.3d 192, 197 (2d Cir. 2013) ("Allegations of fraud are subject to a heightened pleading standard.  When alleging fraud, 'a party must state with particularity the circumstances constituting fraud,' . . . which we have repeatedly held requires the plaintiff to '(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.'" (first quoting FED. R. CIV. P. 9(b); then quoting <u>Mills v. Polar Molecular Corp.</u>, 12 F.3d 1170, 1175 (2d Cir. 1993))).  The facts alleged must "give rise to a <u>strong</u> inference of fraudulent intent." <u>First Cap. Asset Mgmt., Inc. v.</u> <u>Satinwood, Inc.</u>, 385 F.3d 159, 179 (2d Cir. 2004) (emphasis in original) (citation omitted).

Plaintiffs' fraudulent inducement claim is based upon two alleged representations and one material omissions of fact which it contends Defendant utilized to induce Platsky into the 2019 Agreement.[16]   First, Plaintiffs allege Heath "falsely represented that it had the ability to grant Plaintiffs an exclusive distributorship of all the Products described in the 2019 Agreement" (the "Exclusive Distributorship Representation") (Opp'n at 20-21).   Second, Plaintiffs assert Heath "falsely represented that the LMP200 could connect via Bluetooth to a service provider's personal device to efficiently store and transfer the data through software applications already created by the local utility companies" (the "Bluetooth Capability Representation").   (Id. at 21.)   Finally, Plaintiffs contend Heath "omitted that the LMP200 devices would stop working if the data was not removed on a regular basis and that there was, at the time, no means for removing or storing that data" (the "Data Removal Omission").   (Id.)   Plaintiffs argue the FAC adequately alleges "that these representations were false and that Heath [k]new these statements were false at the time its representatives made them." (Id.)   Plaintiffs aver Heath, nonetheless, intended for Plaintiffs

---

[16] Plaintiffs presented their fraudulent inducement argument under Texas law only.   However, the Court has already determined New York law governs their fraudulent inducement claim.

to rely upon the false statements and omission and that it did this "by including them in the contract itself." (Id.)

Defendant contends the FAC fails "to allege that Heath intended to fraudulently induce Platsky to enter into the 2019 Agreement" and that this failure is fatal to their fraudulent inducement claim. (Support Memo at 16.) Defendant elaborates, "[s]imply alleging that Heath 'knew' its statements concerning Bluetooth connectivity were false when made is insufficient". (Id.) Defendant emphasizes that the plain language of the contract contradicts Plaintiffs' claim that Heath represented it could grant Plaintiffs an exclusive distributorship since the contract states that "[a] contractor would have the option of purchasing the ABC calibration station and calibration gasses from Platsky or could use the extensive network of distributors and locations in the surrounding NYC area." (Reply at 6.) Finally, Defendant argues the FAC as pled fails to plead fraud with particularity. Defendant contends the FAC's allegations that Wehnert and Sims made false representations are insufficient in this regard since the FAC does not specify "to whom these purported representations were made and how they were communicated." (Reply 6-7.)

   i. The Exclusive Distributorship Representation was Meaningfully Contradicted by the Written Terms of the 2019 Agreement

As an initial matter, the Court finds the Exclusive Distributorship Representation cannot form the basis of a

fraudulent inducement claim since it is contradicted in a meaningful way by the plain terms of the 2019 Agreement, <u>to wit</u>, the 2019 Agreement's statement that: "A contractor would have the option of purchasing the ABC calibration station and calibration gasses <u>from Platsky or could use the extensive network of distributors and locations in the surrounding NYC Area</u>."[17]  <u>See Republic Nat'l Bank v. Hales</u>, 75 F. Supp. 2d 300, 315 (S.D.N.Y. 1999) ("Under New York law, reasonable reliance is precluded when 'an express provision in a written contract contradicts a prior alleged oral representation in a meaningful fashion.'" (quoting <u>Villa Marin Chevrolet v. Gen. Motors Corp.</u>, No. 98-CV-6167, 1999 WL 1052494, at *5 (E.D.N.Y. Nov. 18, 1999))).  Plaintiffs are sophisticated parties such that this provision should have prompted further inquiry from them considering Plaintiffs believed they were to be the exclusive distributer of the Products.[18]  <u>See Tevac, Inc. v. Dynamics eShop, Inc.</u>, No. 19-CV-3650, at *3 (E.D.N.Y. Sept. 27, 2022) (Seybert, J.) ("As a sophisticated

---

[17] Even if this were not the case, the Court finds the FAC does not sufficiently allege facts plausibly supporting the scienter element of a fraudulent inducement claim.

[18] The Court finds that the FAC's factual statement that Platsky has been in business for nearly a century supports the Court's conclusion that Platsky was a sophisticated party at the time of the 2019 negotiations. <u>See e.g.</u>, <u>Taylor Precision Prods., Inc. v. Larimer Grp. Inc.</u>, No. 15-CV-4428, 2018 WL 4278286, at *25 n.20 (S.D.N.Y. Mar. 26, 2018) (finding where plaintiff was, <u>inter alia</u>, "a corporation founded in 1851" the plaintiff was a sophisticated party).

business entity, [plaintiff's] time to address any purported ambiguity was during negotiations. Given the parties' dispute arises from a contract that was negotiated as part of an arm's length business transaction between two undisputed sophisticated business entities[, plaintiff] will not be heard to object about the plain language of the Agreement.") (internal quotation marks and alterations omitted); see also Clifton v. Vista Comput. Servs., LLC, No. 01-CV-10206, 2002 WL 1585550, at *4 (S.D.N.Y. July 16, 2002) ("When a promise is not extraneous to the terms of the contract, a plaintiff with this level of business sophistication cannot make out a claim that he reasonably relied on those promises.").

####        ii.   Plaintiffs Have Failed to Adequately Plead Scienter

"[A]llegations of scienter . . . are not subjected to the more exacting consideration applied to the other components of fraud." 380544 Can., Inc. v. Aspen Tech., Inc., 633 F. Supp. 2d 15, 29 (S.D.N.Y. 2009) (quoting Breard v. Sachnoff & Weaver, Ltd., 941 F.2d 142, 143 (2d Cir. 1991)) (alteration in original). Nevertheless, while "[m]alice, intent, knowledge and other condition of the mind of a person may be averred generally,' . . . this leeway is not a 'license to base claims of fraud on speculation and conclusory allegations.'" Eternity Glob. Master Fund Ltd. V. Morgan Guar. Tr. Co. of N.Y., 375 F.3d 168,

187 (2d Cir. 2004) (first quoting FED. R. CIV. P. 9(b); then quoting Acito v. IMCERA Grp., Inc., 47 F.3d 47, 52 (2d Cir. 1995)). Plaintiffs "'must allege facts that give rise to a strong inference of fraudulent intent,' which may be established 'either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness.'" Id. (quoting Shields v. Citytrust Bancorp, Inc., 25 F.3d 1124, 1128 (2d Cir. 1994)).

Plaintiffs represent they have alleged facts constituting strong circumstantial evidence of conscious misbehavior or recklessness.[19]  (Opp'n at 23.)  In doing so, Plaintiffs highlight the FAC pleads, at the time it negotiated the 2019 Agreement, Heath knew that the representations regarding the Products' capabilities were false yet it failed to take additional steps to remedy the issues.  (Id.)

Notwithstanding that knowledge may be averred to generally, the Court finds the FAC does not adequately plead scienter.  Instead, the FAC simply states in conclusory fashion that Heath knew its statements were false without alleging facts

---

[19] Plaintiffs do not proffer that Heath had any motive to commit fraud.  However, "[w]here motive is not apparent, it is still possible to plead scienter by identifying circumstances indicating conscious behavior by the defendant, though the strength of the circumstantial allegations must be correspondingly greater." Kalnit v. Eichler, 264 F.3d 131, 142 (2d Cir. 2001).

as to how Heath and/or its representatives possessed such knowledge. See e.g., PetEdge, Inc., 234 F. Supp. 3d at 495 (finding allegations that the alleged scheme "was done 'with [defendant's] knowledge and approval' are too conclusory and speculative" to support a fraudulent inducement claim); see also Citytrust Bancorp, Inc., 25 F.3d at 1129 (holding factual assertions coupled with conclusory allegations that defendants "knew or should have known" or "knew but concealed" are "so broad and conclusory as to be meaningless"); High View Fund, L.P. v. Hall, 27 F. Supp. 2d 420, 426-27 (S.D.N.Y. 1998) ("Neither plaintiffs' conclusory allegations of the [defendant's] knowledge and intent . . . support an inference of fraud."). Similarly, there are no factual allegations pleaded that would allow the Court to infer that Defendant and/or its Representatives learned of, or possessed, the aforementioned knowledge at the time of the 2019 negotiations. Defendant's knowledge its representations were false would have to have been in its possession prior to when negotiations of the 2019 Agreement began, the FAC pleads no facts plausibly alleging this was the case. See e.g., Banco Espirito Santo de Investimento, S.A. v. Citibank, N.A., No. 03-CV-1537, 2003 WL 23018888, at *13 (S.D.N.Y. Dec. 22, 2003) ("[Plaintiff] has failed to plead a cause of action for fraudulent inducement because it has not alleged that Citibank knew the statements to be false at the time the statements were made or that Citibank

intended to defraud BESI.")  Indeed, there are no supportive factual allegations in the FAC that nudge Plaintiffs' fraud allegations from the conclusory to the plausible.

E. Common Law Unfair Competition (Count Three)

"The law of unfair competition in New York encompasses a broad range of unfair practices." CA, Inc. v. Simple.com, Inc., 621 F. Supp. 2d 45, 52 (E.D.N.Y. 2009).  "To state a claim for unfair competition under New York law, 'a plaintiff must allege that a defendant misappropriated plaintiff's labor, skills, expenditures or good will, and displayed some element of bad faith in doing so.'" TileBar v. Tiles, No. 22-CV-3823, 2024 WL 1186567, at *19 (E.D.N.Y. Mar. 15, 2024) (quoting Data Device Corp. v. W.G. Holt, Inc., No. 19-CV-4105, 2020 WL 7024312, at *6 (Nov. 30, 2020)); see also Coca-Cola, N.A. v. Crawley Juice, Inc., No. 09-CV-3259, 2011 WL 1882845, at *6 (E.D.N.Y. May 17, 2011) ("[T]he essence of an unfair competition claim is that 'the defendant has misappropriated the labors and expenditures of another' and has done so in bad faith." (quoting Saratoga Vichy Spring Co. v. Lehman, 625 F.2d 1037, 1044 (2d Cir. 1980))). "Although unfair competition often involves misappropriation of trade secrets or ideas, a claim may be based on misappropriation of client lists, internal company documents, and business strategies 'if wrongful or fraudulent tactics [are] employed.'" Barbagallo v. Marcum LLP, 820 F. Supp. 2d 429, 447 (E.D.N.Y. 2011)

63

(quoting <u>Leo Silfen, Inc. v. Cream</u>, 29 N.Y.2d 387, 328 (1972)).

Additionally, "when a business . . . possesses goodwill constituting property or a commercial advantage in [New York], that goodwill is protected from misappropriation under New York unfair competition law." <u>RBG Mgmt. Corp. v. Vill. Super Mkt., Inc.</u>, No. 22-CV-7996, 2023 WL 5976273, at *10 (S.D.N.Y. Sept. 4, 2023) (quoting <u>ITC Ltd. v. Punchgini, Inc.</u>, 9 N.Y.3d 467, 476 (2007)).

> Typical, and illustrative, examples of unfair competition claims include: "when a defendant takes a plaintiff's customer list and uses it to divest business away from plaintiff and to defendant, or when a defendant obtains access to a plaintiff's proprietary technology for a mobile ticketing platform as part of a potential partnership effort to win bids from mass transit agencies and then uses that proprietary information to submit its own bid while freezing plaintiff out of the transaction."

<u>Id.</u> (quoting <u>Red Mountain Med. Holdings, Inc.</u>, 563 F. Supp. 3d 159, 181-82 (S.D.N.Y. 2021)).

Defendant primarily advances four arguments in support of its Dismissal Motion as to this count.  First, Defendant argues "Plaintiffs have failed to allege that [the] 2021 Draft is a valid agreement or that a confidential relationship existed" between the parties.  (Support Memo at 21.)  Similarly, "there was no non-compete agreement that existed between the parties."  (<u>Id.</u>)  Second, Defendant contends the FAC does not allege "any

misappropriation by Heath of [Plaintiffs'] <u>exclusive</u> commercial advantage, trade secrets, or other property,[20] and, that "[i]nternal sharing of information is insufficient to support a claim for unfair competition." (<u>Id.</u>) Finally, Defendant highlights Plaintiffs have neither alleged "what customers, if any, were lost as a result of Heath's actions" nor pled "how Heath's nonexclusive control of the Products was done in bad faith." (<u>Id.</u> at 22.)

Plaintiffs counter that they have pled a misappropriation claim in that the FAC alleges "Heath misappropriated City Calibration's commercial advantage when it entered the New York City Metropolitan Area market and falsely advertised that it was 'taking over' City Calibration's distribution and calibration business." (Opp'n at 18). Plaintiffs maintain "Heath did this secretly and in [] violation of its promise not to compete with City Calibration." (<u>Id.</u>) Plaintiffs contend Heath's "purpose in doing so . . . was to cause Plaintiffs to use its longstanding relationships with plumbers and [plumbers'] unions in the New York City Metropolitan Area to

---

[20] On arguing Plaintiffs have not pled any misappropriation by Heath of an exclusive commercial advantage owned by Plaintiffs, Defendant appears to cite to the 2019 Agreement's language a vast network of distributors could sell the products to contractors. The Court notes, as highlighted by Plaintiffs, the 2019 Agreement does not form the basis of Plaintiffs' unfair competition claim. Instead, this claim is premised upon the 2021 Agreement.

develop the customer base for the Products, and then misappropriate that customer base through false representations." (Id.) Plaintiffs highlight the 2021 Agreement "promised Plaintiffs exclusive access to the market by making City Calibration Heath's exclusive distributor in the area." (Id.)

The Parties' respective arguments on Plaintiffs' unfair competition claim are enigmatic; however, the exclusive commercial advantage upon which Plaintiffs' unfair competition claim is premised hinges upon whether the 2021 Agreement is a valid, enforceable, contract. If the 2021 Agreement is enforceable then, by its terms, Plaintiffs enjoyed the exclusive right to sell the Products in the North American territory when Defendant knowingly entered the New York City Metropolitan Area market and misappropriated that advantage. The Court has already determined that the FAC plausibly alleges the 2021 Agreement was a valid contract, notwithstanding Defendants' Statute of Frauds arguments. Consequently, the Court declines to dismiss the unfair competition claim at this stage. See Piccoli A/S v. Calvin Klein Jeanswear Co., 19 F. Supp. 2d 157, 169 (S.D.N.Y. 1998) (denying motion to dismiss unfair competition claim where "essence of [plaintiff's] claim [was] that defendants' action in selling [the product] into plaintiff's arguably exclusive territory was akin to

misappropriation or passing off, [which are] traditional bases of unfair competition relief.").[21]

F. <u>Tortious Interference with Economic Advantage (Count Five)</u>

To successfully plead a claim for tortious interference with economic advantage, a plaintiff must allege: "(1) it had a business relationship with a third party; (2) the defendant knew of that relationship and intentionally interfered with it; (3) the defendant acted solely out of malice, or used dishonest, unfair, or improper means; and (4) the defendant's interference caused injury to the relationship." <u>Kirch v. Liberty Media Corp.</u>, 449 F.3d 388, 400 (2d Cir. 2006) (quoting <u>Carvel Corp. v. Noonan</u>, 350 F.3d 6, 17 (2d Cir. 2003)). The plaintiff must also allege that it "would have entered into an economic relationship but for the defendant's wrongful conduct." <u>Corning Inc. v. Shenzhen Xinhao Photoelectric Tech. Co., Ltd.</u>, 546 F. Supp. 3d 204, 215 (W.D.N.Y. 2021) (quoting <u>Downtown Music Publ'g LLC v. Peloton Interactive,</u>

---

[21] The Court notes, however, that "[w]here a plaintiff's unfair competition claim is based entirely on the same alleged conduct proscribed by contract, and plaintiff has pled a breach of contract claim, the unfair competition claim is dismissed as duplicative of the breach claim." <u>Bytemark, Inc. v. Xerox Corp.</u>, 342 F. Supp. 3d 496, 508 (S.D.N.Y. 2018) (collecting cases). Neither Party briefed nor raised this issue as part of Defendant's Dismissal Motion. Since the Court, at this stage of the litigation, does not know "whether the breach of contract claim . . . will survive post-discovery", it will allow the unfair competition claim to proceed at this juncture. <u>Accord</u> <u>N. Shore Window & Door, Inc. v. Andersen Corp.</u>, No. 19-CV-6194, 2021 WL 4205196, at *13 n.12 (E.D.N.Y. Aug. 3, 2021).

Inc., 436 F. Supp. 3d 754, 766 (S.D.N.Y. 2020)).  "'[A]s a general
rule, a defendant's conduct must amount to a crime or an
independent tort' in order to amount to tortious interference with
a prospective economic advantage." Friedman v. Coldwater Creek,
Inc., 321 F. App'x 58, 60 (2d Cir. 2009) (quoting Carvel Corp., 3
N.Y.3d at 190).  "A defendant who has not committed a crime or
independent tort or acted solely out of malice may nevertheless be
liable if he has employed 'wrongful means,'" i.e., "physical
violence, fraud or misrepresentation, civil suits and criminal
prosecutions, and extreme and unfair economic pressure."  Id.
(quotation marks and citation omitted).  However, where a defendant
acts "with a permissible purpose, such as 'normal economic self-
interest,' wrongful means have not been shown, even if the
defendant was 'indifferent to the [plaintiff's] fate." 16 Casa
Duse, LLC v. Merkin, 791 F.3d 247, 262 (2d Cir. 2015).  Likewise,
"New York courts have dismissed complaints that failed to allege
the specific business relationship that was interfered with."
Mastercraft Decorators, Inc. v. Orlando, 356 F. Supp. 3d 259, 267
(W.D.N.Y. 2018) (quoting Johnson & Johnson v. Am. Nat'l Red Cross,
528 F. Supp. 2d 462, 464 (S.D.N.Y. 2008)); see also Lesesne v.
Brimecome, 918 F. Supp. 2d 221, 227 (S.D.N.Y. 2013) (finding the
weight of authority "requires a plaintiff to identify the potential
customers at issue when asserting a cause of action for

interference with prospective economic advantage") (collecting cases).

Defendant argues, <u>inter alia</u>, the FAC's allegation that Plaintiffs have "'established business relationships with LMPs and organizations of LMPs' and 'plumbers unions and organizations,' without naming a single customer" is too conclusory to sustain their tortious interference claim.  (Support Memo at 23.)  The Court agrees.

The FAC presently identifies no specific customer with which Plaintiffs had a valid business relationship and with which Defendant interfered; this failure is fatal to Plaintiffs' tortious interference with economic advantage claim.  <u>See Plasticware, LLC v. Flint Hills Res., LP</u>, 852 F. Supp. 2d 398, 402 (S.D.N.Y. 2012) ("Plaintiff has not adequately alleged <u>specific</u> business relationships with which Defendant allegedly interfered." (emphasis in original); <u>Bayer Schera Pharma AG v. Sandoz, Inc.</u>, No. 08-CV-3710, 2010 WL 1222012, at *8 (S.D.N.Y. Mar. 29, 2010) (dismissing tortious interference claim where plaintiff "ha[d] not identified any specific business entities with which it had business relationships."); <u>Am. Bldg. Maint. Co. of N.Y. v. Acme Prop. Servs., Inc.</u>, 515 F. Supp. 2d 298, 316 (N.D.N.Y. 2007) ("Allegations of tortious interference must be more than just mere suspicions, and, therefore, the complaint must allege 'interference with a specific identified business relationship

69

with a third party.'" (quoting <u>Camp Summit of Summitville, Inc. v.</u>
<u>Visinski</u>, No. 06-CV-4994, 2007 WL 1152894, at *14 (S.D.N.Y. Apr.
16, 2007))). Indeed, the allegations that Plaintiffs have
relationships with LMPs, plumbers' unions and organizations of
LMPs is vague, and is similar to the relationships with "third-
party cover glass manufacturers and mobile device companies and
manufacturers" which the plaintiff pled in <u>Corning</u>. 546 F. Supp.
3d at 216. The <u>Corning</u> court dismissed the <u>Corning</u> plaintiff's
tortious interference claim because, <u>inter alia</u>, "the claim [was]
insufficiently specific." <u>Id.</u> The <u>Corning</u> court emphasized that
to sufficiently plead a tortious interference claim; a plaintiff
is required to "identify the potential customers at issue." <u>Id.</u>
(quoting <u>Lesesne</u>, 918 F. Supp. 2d at 227). <u>Compare</u> <u>Faiveley</u>
<u>Transp. USA, Inc. v. Wabtec Corp.</u>, 758 F. Supp. 2d 211, 221-22
(S.D.N.Y. 2010) (denying motion to dismiss tortious interference
with prospective economic advantage claim where plaintiff
"allege[d] with particularity no less than ten business
relationships with which [defendant] interfered, and includes in-
depth discussion of one business relationship in particular, with
New York City Transit").


[Remainder of page intentionally left blank]


70

<u>CONCLUSION</u>[22]

For the stated reasons, **IT IS HEREBY ORDERED that** Defendant's Motion to Dismiss (ECF No. 29) is GRANTED IN PART AND DENIED IN PART to the extent that:

1. Defendant's Motion to Dismiss Plaintiffs' Breach of Contract claim (Count One) is DENIED;

2. Defendant's Motion to Dismiss Plaintiffs' Promissory Estoppel Claim (Count Two) is GRANTED;

3. Defendant's Motion to Dismiss Plaintiffs' Unfair Competition claim (Count Three) is DENIED;

4. Defendant's Motion to Dismiss Plaintiffs' Fraudulent Inducement claim (Count Four) is GRANTED; and

5. Defendant's Motion to Dismiss Plaintiffs' Tortious Interference with Economic Advantage claim (Count Five) is GRANTED.

---

[22] To the extent not explicitly addressed, the Court has considered the remainder of the Parties' arguments in support of and in opposition to the Dismissal Motion and, to the extent they were not explicitly addressed, the Court finds them to be without merit.

**IT IS FURTHER ORDERED** that the parties are referred to Magistrate Judge Tiscione for all pre-trial matters.

SO ORDERED.

/s/ JOANNA SEYBERT
Joanna Seybert, U.S.D.J.

Dated: March 29, 2024
       Central Islip, New York